CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 24 2023

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| TORIMIKA HAIRSTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:23-cv-00011 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| NILIT AMERICA, INC., | ) | By:    Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Plaintiff Torimika Hairston ("Hairston") brings this civil rights action against Defendant Nilit America, Inc. ("Nilit"), claiming that she was a victim of racial discrimination and that she was fired for opposing that unlawful discrimination, in violation of Title VII, the Virginia Human Rights Act ("VHRA"), and Virginia common law. Nilit has moved to dismiss four of Hairston's five claims.[1] (ECF No. 7.) The motion has been fully briefed and, after review of the pleadings, briefs, and applicable law, the court will grant Nilit's motion in part and deny it in part.[2]

## I.    BACKGROUND

The facts are taken from Hairston's complaint and, at this stage, are presumed to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Hairston is an African American woman who worked as a supervisor in Nilit's Martinsville facility from April 10, 2021, until she was terminated on September 16, 2022.

---

[1] Nilit has moved to dismiss counts 2–5, but not count 1. (*See* Mem. Supp. Mot. Dismiss at 1 [ECF No. 8].) Nilit has also moved to dismiss some of Hairston's requests for punitive damages. (*Id.* at 7.)

[2] The court dispensed with oral arguments on the motion because it would not aid in the decisional process.

(Compl. ¶¶ 10, 22, 40 [ECF No. 1].) According to Hairston, she received excellent performance reviews during her tenure at Nilit despite receiving "little to no training" for her position. (*Id.* ¶¶ 25–26.) At some point during her employment, this lack of training frustrated Hairston, which caused her to leave Nilit for a short period of time. (*Id.* ¶ 27.) But Hairston returned to her position after Nilit promised to train her. (*Id.*) Despite these assurances, however, Hairston alleges that Nilit failed to train her or invest any resources into her employment after she returned. (*Id.* ¶ 28.) But Nilit's non-African American employees, Hairston contends, did not suffer from this adverse treatment. (*Id.* ¶ 29.) Despite this perceived disparate treatment, Hairston continued working in her supervisory position and consistently received "outstanding praise" from her supervisors. (*Id.* ¶ 30.)

This status-quo continued until September 1, 2022, when Ricardo Fernandez ("Fernandez")—Nilit's Director of Operations—and Pedro Martinez ("Martinez") called Hairston into Fernandez's office to discuss changes they planned to make at the Martinsville facility. (*Id.* ¶¶ 31–32.) After telling Hairston that she was doing an excellent job, they informed her that they were going to demote her, reduce her pay, and replace her with Peggy Adkins, a White co-worker with less experience. (*Id.* ¶¶ 33–34.) Hairston was upset by this news and told Fernandez that she "might just quit if Nilit insisted on treating her this way." (*Id.* ¶ 36.) In response, Fernandez allegedly told Hairston that the decision was final, but that he wanted her to "stay a few weeks longer" so that she could train Adkins. (*Id.* ¶¶ 35, 37; Hairston Letter to Spivey, Sept. 14, 2022 [ECF No. 1-3] [hereinafter "Hairston Letter"].) Hairston then told Fernandez and Martinez that she would accept the demotion for the time being and would let them know whether she was going to resign or continue working for Nilit. (Compl. ¶ 37.)

On September 14, 2022, Hairston followed up by sending an email to Bryan Spivey—Nilit's Human Resources ("HR") Director—complaining about perceived racial discrimination. (*Id.* ¶ 38; Hairston Letter.) In the email, Hairston explained that she was "not going to quit," that she opposed her demotion because she believed it to be race related, and expressly stated that she would take the issue to court. (Hairston Letter.)

Two days after Hairston sent the email, Nilit called a team meeting to discuss the changes being made at the facility. (Compl. ¶ 41.) In that meeting, Martinez announced that Hairston would be "stepping down" from her supervisory position and that Adkins would be taking her place. (*Id.* ¶ 42.) Hairston then spoke up and said that she was "stepping down *because* Adkins was taking her place." (*Id.* ¶ 43 (emphasis in original).) According to Hairston, she was calm, polite, and respectful when she made this comment. (*Id.* ¶ 44.) That afternoon, however, Spivey called Hairston into his office and notified her that she was being terminated, effective immediately. (*Id.* ¶ 45.) Spivey and two other employees then escorted Hairston off the property and banned her from the premises. (*Id.* ¶ 47.) Three days later, Hairston received a letter, dated September 16, 2022, informing her that she was terminated for "fomenting fellow employees" at the September 16 meeting, which "interrupt[ed] and confuse[d]" the circumstances surrounding her demotion. (*Id.* ¶¶ 48–49; Termination Letter, Sept. 16, 2022 [ECF No. 1-4].)

Following these events, Hairston filed a charge with the Equal Employment Opportunity Commission ("EEOC") on October 4, 2022, alleging that Nilit discriminated and retaliated against her based on her race. (Compl. ¶ 12; EEOC Charge [ECF No. 1-1].) On May 5, 2023, the EEOC issued Hairston a notice of her right to sue. (Compl. ¶ 14; Notice of Right

to Sue [ECF No. 1-2].) The following day, Hairston filed suit in this court and asserted five claims: race discrimination in violation of Title VII of the Civil Rights Act (Count 1) and the Virginia Human Rights Act ("VHRA") (Count 2); retaliation for reporting discrimination in violation of Title VII (Count 3) and Virginia Code § 40.1-27.3 (Count 4); and a *Bowman* claim under Virginia common law (Count 5). (Compl. ¶¶ 51–86.) Nilit has moved to dismiss Counts 2–5. (ECF No. 7.) The motion has been fully briefed by the parties, and for the following reasons, will be granted as to Counts 2 and 5, but denied as to Counts 3 and 4.

## II.   STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In determining facial plausibility, the court must accept all factual allegations in the complaint as true. *Id.* The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (cleaned up). Therefore, the complaint must "allege facts sufficient to state all the elements of [the] claim." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### III.   ANALYSIS

### A.  Hairston's VHRA Discrimination Claim (Count 2)

Nilit argues that Hairston fails to state a claim for racial discrimination under the VHRA because she did not exhaust that claim as required by Virginia law. (Def.'s Br. Supp. Mot. Dismiss at 2 [ECF No. 8]; Def.'s Reply Br. at 2 [ECF No. 14].) Nilit contends that while Hairston received a notice of right to sue from the EEOC, she did not receive a separate notice from the Virginia Office of Civil Rights ("VOCR"), which was required to properly exhaust her VHRA claim. (Def.'s Br. Supp. Mot. Dismiss 2; Def.'s Reply Br. 3.) The court agrees with Nilit.

The current iteration of the VHRA provides that employers may not "discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's race . . . ." Va. Code Ann. § 2.2-3905(B)(1)(a). It also "prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act." *Jordan v. Sch. Bd. of the City of Norfolk*, No. 2:22cv167, 2022 WL 16835868, at *11 (E.D. Va. Nov. 9, 2022) (quoting *Hice v. Mazzella Lifting Tech., Inc.*, 589 F. Supp. 3d 539, 553 (E.D. Va. 2022)). Section 2.2-3907 outlines the process by which an individual can make a complaint with the VOCR and provides that "[p]rivate citizens may only sue under the VHRA once they have 'been provided a notice of [their] right to file a civil action pursuant to § 2.2-3907.'" *Id.* at *10 (quoting Va. Code Ann. § 2.2-3908(A)); *see Moss v. Saja Rest. Grp., LLC*, No. 5:22-CV-00014, 2023 WL 3034605, at *10 (W.D. Va. Apr. 21, 2023).

Here, Hairston acknowledges that she did not receive notice of a right to sue from the VOCR; she only received one from the EEOC. But she argues that her failure to obtain a notice from the VOCR does not bar her claim. Instead, she contends that a valid workshare agreement[3] exists that results in simultaneous exhaustion of both her federal and state law claims, and that obtaining a notice of right to sue from only the EEOC is sufficient to exhaust her state-law claims as well. (Pl.'s Br. Opp. at 3 [ECF No. 11]; *see* 2021 Workshare Agreement [ECF No. 11-1]; 2022 Extension of Workshare Agreement [ECF No. 11-2]; 2023 Extension of Workshare Agreement [ECF No. 11-3].) To Hairston's point, the operative Workshare Agreement does provide that "the EEOC's receipt of charges on the [VOCR's] behalf will automatically initiate the proceedings of both the EEOC and the [VOCR] for the purposes of Section 706(c) and (e)(1) of Title VII." (2021 Workshare Agreement); *see Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019) ("If the state or local agency has a 'worksharing' agreement with the EEOC, a complainant ordinarily need not file separately with federal and state agencies. She may file her charge with one agency, and that agency will then relay the charge to the other.").

"However, just because a complainant may *initiate* the VOCR process by filing with the EEOC, does not mean that the EEOC's right-to-sue notification also permits an individual to *file suit* under the VHRA. Instead, the federal and state processes run in parallel. The VHRA

---

[3] The court believes it is necessary to explain workshare agreements and why they are used. Under Title VII, states that have analogous anti-discrimination laws have exclusive jurisdiction over claims that are covered by both federal and state law for 60 days. *See* 42 U.S.C. § 2000e-5(c). The federal government cannot investigate the claims until the 60-day clock runs or the state "earlier terminate[s]" its jurisdiction. Workshare agreements operate to waive the state's exclusive jurisdiction for the sake of efficiency. *Jordan*, 2022 WL 16835868, at *11. Under these agreements, the state agency ordinarily waives its right to exclusive jurisdiction and acknowledges that the EEOC's receipt of a claim operates to initiate proceedings under both state and federal statutes. *See, e.g., id.* (citing the 2021 VOCR-EEOC Work-Sharing Agreement).

only permits an individual 'who has been provided a notice of [her] right to file a civil action pursuant to § 2.2-3907' to bring a civil suit under the VHRA." *Tattrie v. CEI-Roanoke, LLC*, No. 7:23-CV-079, 2023 WL 4186383, at *3 (W.D. Va. June 26, 2023) (quoting Va. Code Ann. § 2.2-3908(A)).  And § 2.2-3907 only refers to the "Office" of Civil Rights issuing a notice of right to sue with respect to exhaustion of VHRA claims. Accordingly, "[t]here is no ambiguity in this statutory context: only the state agency can notify a complainant of their right to sue under state law." *Tattrie*, 2023 WL 4186383, at *3. Hairston, therefore, was *required* to obtain a notice of right to sue from the VOCR, regardless of the operative Workshare Agreement.

Indeed, this conclusion is militated by this court's recent decision in *Moss* and by at least two other federal courts that have considered this issue. *See Moss*, 2023 WL 3034605, at *11–12; *Jordan*, 2022 WL 16835868, at *11–13 (dismissing a VHRA claim where the plaintiff had obtained a right to sue notice from the EEOC, but not the VOCR); *Tattrie*, 2023 WL 4186383, at *3 (same). Furthermore, as the Eastern District of Virginia noted in *Jordan*, federal courts sitting in other states with similar workshare agreements have also treated the state and federal processes as separate. 2022 WL 16835868, at *12–13 (collecting cases). In other words, an EEOC notice of right to sue does not confer a right to sue under state law, just as a state-issued notice of right to sue does not confer a right to sue under Title VII.

This result is also reinforced by Virginia state court decisions. For example, in *Parikh-Chopra v. Strategic Management Services, LLC*, the court confirmed that the EEOC and VOCR processes are separate:

> [T]he EEOC complaint is dispensed with as irrelevant to this action. EEOC complaints are pursued under federal law. A plaintiff who exhausts her administrative appeals in the EEOC is entitled to bring a lawsuit in federal court. *The Virginia statutory*

> *scheme does not recognize the exhaustion of a complaint before a federal agency*
> *as a precondition to bringing a civil action in a Virginia state court.*

No. CL21-3051, 2021 WL 9918463, at *2 (Va. Cir. Ct. Dec. 9 2021) (emphasis added). That court went on to state that "[o]nly the presentment of claims and the exhaustion of the administrative remedies before the [VOCR] satisfy the prerequisite to filing a discrimination lawsuit in Virginia's state courts." *Id.*; *see also Patel v. Virginia.*, No. CL21-6527, 2021 WL 2808929, at *3 (Va. Cir. Ct. July 2, 2021) ("[A]uthorization to commence a civil [VHRA] action hinges upon the completion of an administrative process *by the Commonwealth*.") (emphasis added). Accordingly, Hairston was required to obtain a separate notice of her right to sue from the VOCR.

Because Hairston failed to obtain a notice or her right-to-sue from the VOCR, she has failed to exhaust her VHRA claim and Nilit's motion will be granted as to Count 2. But given the nature of this claim, the court will dismiss it without prejudice to permit Hairston to request a right-to-sue notice from the VOCR.[4]

### B. Hairston's Retaliation Claims (Counts 3 and 4)

Nilit argues that Hairston has failed to state a retaliation claim under both Title VII and Virginia Code section 40.1-27.3 because she did not engage in protected activity and, even if she did, her complaints were not but-for causes of her subsequent termination. (Def.'s Br. Supp. Mot. Dismiss at 3; Def.'s Reply Br. at 5.)

---

[4] While Hairston may exhaust and then reassert her VHRA claim, this Circuit recognizes the "widely accepted prohibition on duplicative damages." *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 460 (4th Cir. 2011). Hairston, therefore, "may not receive a double recovery under different legal theories for the same injury." *Id.*

Virginia Code section 40.1-27.3 provides that "[a]n employer shall not discharge . . . or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee . . . reports a violation of any federal or state law . . . to a supervisor . . . ." Va. Code. Ann. § 40.1-27.3(A)(1). Similarly, Title VII proscribes retaliatory action against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). Accordingly, for Hairston to plead a prima facie case of retaliation under either Virginia Code section 40.1-27.3 or Title VII,[5] she must allege: (1) that she engaged in protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events. *Boyer-Libeau v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (Title VII context); *see also Wood v. Bristol Va. Utility Auth.*, No. 1:22-CV-00018, 2023 WL 2482973, at *7 (W.D. Va. Mar. 13, 2023) (explaining Virginia whistleblower statute).

### 1. Protected Activity

As a threshold matter, the court is satisfied that Hairston has sufficiently alleged that she engaged in protected activity. It is axiomatic that "[a]n employer may not . . . take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Oppositional conduct "encompasses utilizing informal grievance procedures as well as staging informal protests and *voicing one's opinions* in order to bring attention to an employer's

---

[5] The parties seemingly agree that retaliation under Title VII and Virginia Code section 40.1-27.3 require proof of the same elements. In any event, the statutory construction of the applicable Virginia Code section makes clear that an employee must engage in protected conduct and suffer an adverse employment action in retaliation for engaging in that conduct. Accordingly, the court will analyze both claims together.

discriminatory activities." *Id.* (emphasis added). "'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009)) (cleaned up).

If the court accepts her allegations as true, as it must, Hairston engaged in protected oppositional conduct on two separate occasions. First, on September 14, 2022, Hairston sent a letter to Nilit's HR director complaining about disparate treatment on the basis of race. Indeed, the second sentence of the letter expressly states that it is "a formal complaint of unfair treatment and racial discrimination." (Hairston Letter.) Hairston explained that she believed she was racially discriminated against because she was demoted in favor of a White employee despite being "an outstanding employee." (*Id.*) The letter also goes on to state that "[Hairston is] going to accept the demotion and pay cut and sue [Nilit] for racially discriminating against [her]." (*Id.*) This letter constitutes oppositional conduct, which includes "voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin*, 149 F.3d at 259.

Two days after Hairston sent the letter to Spivey, she again voiced her opposition to her demotion during the Nilit team meeting. (Compl. ¶ 42.) After Martinez announced that Hairston would be "stepping down" from her supervisory position and that Adkins would be taking her place, Hairston spoke up and said that she was "stepping down *because* Adkins was taking her place." (*Id.* ¶ 43 (emphasis in original).) Because Hairston's supervisors were attending the meeting, the court construes this as a second complaint to a supervisor.

Accordingly, Hairston has sufficiently alleged that she engaged in oppositional conduct constituting protected activity for the purposes of her retaliation claims.[6]

## 2. Causal Connection

At this early stage, Hairston has also plausibly alleged a sufficient causal connection between her protected activity and her termination. To demonstrate a causal connection between a protected activity and an adverse employment action, Hairston is required to show that her "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). But a "but-for" cause does not mean the only cause; "[o]ften, events have multiple but-for causes." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020). "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004).

As noted, Hairston engaged in protected conduct on at least two occasions prior to her discharge, and the afternoon immediately following Hairston's comments at the team meeting, Spivey summonsed Hairston to his office and notified her that she was being terminated effective immediately. (Compl. ¶ 45.) Spivey and two other employees then escorted Hairston off the property and banned her from the premises. (*Id.* ¶ 47.) Three days later, Hairston received a letter informing her that she was terminated for "fomenting fellow employees" at the September 16 meeting, which "interrupt[ed] and confuse[d]" the circumstances

---

[6] While Nilit contends that Virginia Code § 40.1-27.3 requires Hairston to identify some violation of federal or state law (Def.'s Reply Br. at 7), racial discrimination plainly violates the provisions of Title VII, which is a federal law. In the court's view, therefore, Hairston's complaint of alleged racial discrimination was self-evidently a complaint about a violation of federal law.

surrounding her demotion. (*Id.* ¶¶ 48–49; Termination Letter, Sept. 16, 2022.) In other words, the termination letter explicitly stated that Hairston was terminated for *her conduct at the meeting* where she voiced her opposition to her demotion. This is more than sufficient to trigger a plausible inference of a causal relationship, especially when drawing all reasonable inferences in Hairston's favor.[7] *See, e.g., Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (recognizing that, where a plaintiff shows that he was discharged soon after engaging in protected activity, the evidence is sufficiently suggestive of retaliatory motive); *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 175 (4th Cir. 2014) (finding that a seven-month period between protected activity and retaliation "supports an inference of [a] retaliatory motive"); *see also Rhoads v. F.D.I.C.*, 257 F.3d 373, 394 (4th Cir. 2001).

For these reasons, Hairston has alleged a sufficient causal nexus between her two complaints and her subsequent termination.

**C. Hairston's *Bowman* Claim (Count 5)**

Nilit argues that Hairston has failed to establish an actionable *Bowman* claim because the VHRA—the statute Hairston relies on—cannot serve as the basis for this type of claim. (Def.'s Br. Supp. Mot. Dismiss at 5; Def.'s Reply Br. at 14.) The court agrees.

*Bowman* claims stem from the Virginia Supreme Court's decision in *Bowman v. State Bank of Keysville,* 229 Va. 534 (1985), in which that court first recognized an exception to the state's employment at-will doctrine and created a cause of action for an employee whose termination

---

[7] Although Nilit contends that Hairston was not invited to the September 16, 2022 meeting, that she "inserted herself," and that her comments were disrespectful and disruptive (*see* Def.'s Reply Br. at 5 n.2), the court is required to draw reasonable inferences in Hairston's favor. Accordingly, these arguments are better suited for summary judgment or trial, as Nilit somewhat concedes. (*Id.*)

violates the public policy of the state. *See Rowan v. Tractor Supply Co.*, 263 Va. 209, 211 (2002). In cases dealing with *Bowman*-type exceptions to the employment at-will doctrine, however, Virginia courts have consistently characterized these exceptions as "narrow." *Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc.*, 293 Va. 167, 172 (2017); *see Rowan*, 263 Va. at 213 ("While virtually every statute expresses a public policy of some sort . . . termination of an employee in violation of the policy underlying any one statute does not automatically give rise to a common law cause of action for wrongful discharge." (cleaned up) (quoting *City of Va. Beach v. Harris,* 259 Va. 220, 232 (2000)).

Accordingly, there are only three circumstances in which an at-will employee may establish that her discharge violated public policy: (1) where an employer fired an employee for exercising a statutorily created right; (2) when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy;" or (3) "where the discharge was based on the employee's refusal to engage in a criminal act." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 221 (4th Cir. 2015) (quoting *Rowan,* 263 Va. at 214); *see also Dunn v. Millirons*, 176 F. Supp. 3d 591, 598 (W.D. Va. 2016), *aff'd*, 675 F. App'x 314 (4th Cir. 2017). Regardless of which category is pursued, a *Bowman* claim "must find root in a state statute." *McCarthy v. Texas Instruments, Inc.*, 999 F. Supp. 823, 829 (E.D. Va. 1998) (citing *Lawrence Chrysler Plymouth Corp. v. Brooks*, 251 Va. 94, 98 (1996)).

Here, Hairston uses the VHRA as the statutory foundation for her *Bowman* claim, arguing that her demotion and subsequent termination violated the statute's public policy against racial discrimination. *See* Va. Code Ann. § 2.2-3900(B)(1) (stating Virginia's policy

- 13 -

against "unlawful discrimination because of race . . . ."); Va. Code Ann. § 2.2-3905(B)(1)(a)

("It is an unlawful discriminatory practice for [a]n employer to . . . discharge, or otherwise

discriminate against any individual . . . because of such individual's race . . . ."). But because

the VHRA creates rights and provides the attendant remedy by permitting a private right of

action under its provisions, it may not be used to assert a *Bowman* claim. *See Sch. Bd. of City of

Norfolk v. Giannoutsos,* 238 Va. 144, 147 (1989) ("[W]here a statute creates a right and provides

a remedy for . . . that right, then that remedy is exclusive unless the statute says otherwise.");

*Carmack v. Virginia*, No. 1:18-CV-00031, 2019 WL 1510333, at *13 (W.D. Va. Apr. 5, 2019)

("[S]tatutes containing their own remedy cannot also support a *Bowman* claim."); *Tattrie*, 2023

WL 4186383, at *5 (holding that the VHRA cannot provide the statutory foundation for a

*Bowman* claim). Nevertheless, Hairston argues that since the legislature repealed the

"preclusion provision"—as Hairston calls it—of the VHRA in 2020, the "remedies under the

VHRA are no longer exclusive." (Pl.'s Opp. Br. at 10.) But this argument is unpersuasive.

Since the VHRA was enacted in 1987, it has undergone two principal revisions—in

1995 and 2020. From 1987 to 1995, the VHRA did not provide for private causes of action.

*See* Va. Code Ann. §§ 2.1-714–2.1-725 (1987). During this period, § 2.1-725 provided that

"nothing in this chapter creates, nor shall it be construed to create, an independent or private

cause of action to enforce its provisions." Because the VHRA did not provide a private cause

of action, the Virginia Supreme Court held that *Bowman* claims included "instances where . . .

employees are terminated because of discrimination" based on the VHRA's public policies.

*Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 106 (1994).

- 14 -

In 1995, the General Assembly made two major changes to the VHRA. First, it added a private right of action which permitted an employee to "bring an action in a general district or circuit court having jurisdiction over the employer who allegedly discharged the employee in violation of this section." Va. Code Ann. § 2.2-725(B) (1995). Second, and building off the newly created private right of action, the General Assembly added a "preclusion provision" that expressly limited private causes of action based on the VHRA's public policies to "applicable federal or state civil rights statutes or local ordinances." Va. Code Ann. § 2.2-725(D) (1995). When it subsequently interpreted these amendments to the VHRA, the Virginia Supreme Court held that, by adding the preclusion provision, "the General Assembly plainly manifested an intent to abrogate the common law with respect to causes of action for unlawful termination of employment based upon the public policies reflected in the Act." *Doss v. Jamco, Inc.*, 254 Va. 362, 370 (1997). From 1995 until the preclusion provision was repealed, therefore, courts consistently held that the VHRA could not supply the statutory basis for *Bowman* claims. *See Hice*, 589 F. Supp. 3d at 551–52 (collecting cases).

Twenty-five years later, as Hairston points out, the General Assembly repealed the preclusion provision. 2020 Va. Acts 1140. While it repealed this provision, the General Assembly did not eliminate a private right of action for VHRA claims. *Id.* Instead, the legislature added two additional procedures, as discussed above, that provide extensive procedures mandating that a plaintiff exhaust her claims with the VOCR. As it stands, therefore, the VHRA provides for an administrative scheme *followed by* a private right of action. *See Tattrie*, 2023 WL 4186383, at *5.

As the court concluded in *Hice*, Hairston "cannot work around the structure, limitations, and remedies of the VHRA by bringing a related *Bowman* claim. The VHRA prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act." 589 F. Supp. 3d at 553. Allowing Hairston's *Bowman* claim to proceed, therefore, would undercut the VHRA's administrative process and attendant private right of action provided by the statute. At bottom, Hairston cannot have it both ways; she cannot access the VHRA's private right of action, which she necessarily does in Count 2, while simultaneously using the VHRA as a statutory predicate for her *Bowman* claim. Accordingly, Nilit's motion will be granted as to Count 5.

## IV.   CONCLUSION

For these reasons, Nilit's motion to dismiss (ECF No. 7) will be granted with respect to Counts 2 and 5, but denied as to Counts 3 and 4.[8]

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 24th day of August, 2023.

_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[8] Nilit also asserts that the court should dismiss Hairston's request for punitive damages, but "punitive damages is not a 'cause of action' subject to dismissal under Rule 12(b)(6)." *Rathbone v. Haywood Cnty.*, No. 1:08CV117, 2008 WL 2789770, at *1 (W.D.N.C. July 17, 2008); *see Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 631 (W.D. Va. 2014) ("A plain reading of Rule 12(b)(6) indicates that the rule may be used only to dismiss a 'claim' in its entirety . . . . As such, the nature of the relief included in the demand for judgment is immaterial to the question of whether a complaint adequately states a claim upon which relief can be granted."); *Johnston v. Speedway, LLC*, No. 7:21CV00100, 2021 WL 1662725, at *4 (W.D. Va. Apr. 28, 2021) (denying defendant's motion to dismiss plaintiff's request for punitive damages); *Flores v. Va. Dep't of Corr.*, No. 5:20-cv-00087, 2021 WL 668802, at *7 (W.D. Va. Feb. 22, 2021).