CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

**December 20, 2024**

LAURA A. AUSTIN, CLERK
BY:
    s/B. McAbee
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| Torimika Hairston, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:23-cv-00011 |
| | ) | |
| Nilit America, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## **<u>MEMORANDUM OPINION</u>**

Plaintiff Torimika Hairston brought this action against Defendant Nilit America, Inc. ("Nilit"), her former employer, for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and Virginia law. Hairston, who is Black, previously worked as a supervisor for Nilit. In September 2022, Nilit informed her that she would be demoted from the supervisor role and replaced by a white employee. After learning about her demotion, Hairston submitted a letter to Nilit's human resources division that accused the company of racial discrimination. Two days later, Nilit terminated Hairston's employment, citing, among others, her disruptive behavior.

This matter is before the court on the parties' cross-motions for summary judgment. Hairston moves for summary judgment on her retaliation claims. (Dkt. 51.) Nilit moves for summary judgment on all claims, and, in the alternative, on Hairston's eligibility for backpay, emotional distress, and punitive damages. (Dkt. 53.) The court concludes that genuine disputes of material fact preclude summary judgment to either party on Hairston's retaliation

claims, but that Nilit is entitled to summary judgment on her discrimination claims. The court

also rules Nilit is entitled to summary judgment on Hairston's request for punitive damages,

though Hairston has created a jury question regarding her eligibility for backpay and emotional

distress damages. Accordingly, the court will deny Hairston's motion for partial summary

judgment and grant in part and deny in part Nilit's motion for summary judgment.

## I.     Background

### A. Factual History

The following material facts are taken from the summary judgment record and, unless

otherwise stated, are undisputed.

#### 1.  Hairston's employment at Nilit

Nilit is a nylon fiber manufacturing company that operates a production facility near

Martinsville, Virginia. (Am. Compl. ¶ 11 (Dkt. 22).) In April 2021, Nilit hired Hairston to

work as a spinning operator at the facility. (Pl.'s Ex. D, Dep. of Torimika Hairston at 39:15–

20, May 16, 2024 (Dkt. 52-4) [hereinafter "Hairston Dep."].) In July 2021, Nilit promoted

Hairston to serve as a shift leader for the spinning department and as a fill-in supervisor.

(Def.'s Ex. 4, July 23, 2021 Personnel Action Notice (Dkt. 54-4); Pl.'s Ex. N, Def.'s Answers

& Objections to Pl.'s First Set of Interrogs. at 1 (Dkt. 52-14) [hereinafter "Def.'s Answers to

Interrogs."].)

Nilit provided annual written performance evaluations to employees during the first

quarter of each calendar year. (Pl.'s Ex. A, Dep. of Ricardo Fernandes at 21:6–22, May 29,

2024 (Dkt. 52-1) [hereinafter "Fernandes Dep."].) Hairston received her performance

evaluation for the 2021 calendar year in March 2022. (Pl.'s Ex. H, Dep. of Pedro Martinez at

67:16–68:8, May 29, 2024 (Dkt. 52-8) [hereinafter "Martinez Dep."].) The evaluation gave her an overall "score" of 8.25, which placed her slightly above the benchmark for "[g]ood performance, satisfie[d] job requirements." (Pl.'s Ex. E, 2021 Performance Evaluation at 1 (Dkt. 52-5).) Hairston's evaluator, production manager Jimmy Cockram, wrote that "Torimika's attitude is always amazing, she is a delight to be around." (*Id.* at 4.) In March 2022, Hairston received a slight pay raise that increased her hourly wage from $24.15 to $25.00. (Pl.'s Ex. G, March 6, 2022 Personnel Action Notice (Dkt. 52-7).)

Hairston temporarily resigned from Nilit on April 10, 2022. (Def.'s Ex. 9, Resignation Letter at 3 (Dkt. 54-9).) She returned to the company later that month after Nilit agreed to provide her more training. (*See* Hairston Dep. at 298:13–299:9; Fernandes Dep. at 27:14–28:17; Martinez Dep. at 69:6–70:7.) Upon returning, she worked as the supervisor of the Inspect and Packaging ("IP") department.[1] (Hairston Dep. at 42:10–13.) The IP department is responsible for inspecting and grading the nylon produced in the facility and packaging it for distribution. (*Id.* at 42:14–21.) In this role, Hairston supervised approximately 25 employees. (Martinez Dep. at 24:7–19.) Pedro Martinez, the facility's quality manager, was her direct supervisor. (*See id.* at 9:7–13; Hairston Dep. at 80:1–3.) Martinez, in turn, reported to Ricardo Fernandes, the plant manager. (Fernandes Dep. at 7:20–8:21.)

Nilit did not give Hairston any formal training for the IP supervisor position, but Martinez provided her with some coaching for the role. (*Id.* at 28:13–29:5; Martinez Dep. at 58:3–6, 59:6–7.) Hairston states that she requested more formal training numerous times but

---

[1] In its answers to Hairston's interrogatories, Nilit states that Hairston began working as IP supervisor in March 2022, before she temporarily resigned from the company. (Def.'s Answers to Interrogs. at 1.) Hairston, by contrast, testifies that she moved to the IP department in late April 2022. (Hairston Dep. at 42:10–13.) The exact date she was named IP supervisor is not material to her claims.

that Nilit never provided it.   (Hairston Dep. at 89:13–90:18.)    At the same time, she acknowledges she taught herself on the job and was not missing the information needed to complete her job responsibilities.  (*See id.* at 93:19–116:17.)  Hairston did not receive a formal, written performance evaluation during her time as IP supervisor.  (Martinez Dep. at 60:10–12, 64:4–6.)  But she states that she "got good evaluations and good feedback" and that "no one ever pulled [her] to the side to tell [her that her] performance was lacking."  (Pl.'s Supp. Answers to Def.'s First Set of Interrogs. at 10 (Dkt. 54-10) [hereinafter "Pl.'s Answers to Interrogs."].)

Fernandes and Martinez offer a different account of Hairston's performance as IP supervisor.  They both state that Hairston "was not performing well as a supervisor," and "over time it became clear that [she] lacked the skills necessary to be a good manager of people."  (Def.'s Ex. 6, Decl. of Ricardo Fernandes ¶¶ 2–3 (Dkt. 54-6) [hereinafter "Fernandes Decl."]; Def.'s Ex. 11, Decl. of Pedro Martinez ¶ 2 (Dkt. 54-11) [hereinafter "Martinez Decl."]; *see also* Fernandes Dep. at 25:19–26:11 (stating that management concluded Hairston "was not able to deliver" the "abilities or skills" needed to serve as IP supervisor due to her "lack of experience").)  According to Fernandes and Martinez, Hairston was "often unprepared" for daily meetings that addressed key performance indicators ("KPIs") and "could not answer simple questions about productivity or staffing issues during those morning meetings." (Fernandes Decl. ¶ 7–8; Martinez Decl. ¶ 7.)  By their account, Hairston had "no explanations"

for lagging productivity in the IP department and did not "take any initiative to address the issues or productivity problems among her staff."[2]  (Fernandes Decl. ¶ 9; Martinez Decl. ¶ 8.)

Martinez states that he tried to address these performance issues by sending Hairston a daily checklist "that would help her meet the bare minimum requirements of her position." (Martinez Decl. ¶ 16; *see* Def.'s Ex. 12, IP Supervisor Checklist (Dkt. 54-12).)  According to Martinez, Hairston used the spreadsheet off and on for a few days but "eventually stopped using it altogether and reverted to her prior levels of performance."  (Martinez Decl. ¶ 16.) Hairston contends that she never received the checklist from Martinez.  (Hairston Dep. at 52:8–53:16.)

2.  Hairston's demotion from the IP supervisor position

Around this time, Fernandes and Martinez agreed "it would be best to bring in a new supervisor for the department."  (Fernandes Decl. ¶¶ 13–14; Martinez Decl. ¶ 17.)  Around September 1, 2022, Hairston met with Fernandes (and possibly Martinez) to discuss her future at Nilit.  (*See* Hairston Dep. at 121:19–125:12.)  Hairston recalls that this meeting focused on her requests for training and that Fernandes promised to provide more training opportunities. (*Id.*; Pl.'s Answers to Interrogs. at 11.)  Nilit, on the other hand, asserts that the meeting addressed Hairston's "performance issues and how they might be able to retain [her] at Nilit but move her to a different role."  (Def.'s Answers to Interrogs. at 1–2.)

Around September 14, 2022, Fernandes and Martinez asked Hairston if she would step down as IP supervisor and move to a position as a dryer operator.  (Hairston Dep. at 122:13–

---

[2] Martinez, for example, explains that Hairston failed to ensure her supervisees regularly updated the board and paper sheets the IP department used to track inspections.  (Martinez Decl. ¶¶ 9–13.)  Hairston disputes that she was responsible for updating the department's tracking board.  (Hairston Dep. at 47:20–48:10.)

123:10, 131:17–132:16.)  The dryer operator position paid less than the IP supervisor position

and required that Hairston work a different shift.  (*Id.* at 126:1–5.)  Fernandes and Martinez

proposed that Peggy Adkins, a white Nilit employee, would replace Hairston as IP supervisor.[3]

(*Id.*)  Adkins had worked for Nilit for approximately 20 years but was not working in the IP

department at the time.  (Fernandes Dep. at 31:1–13; Def.'s Answers to Interrogs. at 9.)

Later the same day, Hairston hand-delivered a letter to Bryan Spivey, Nilit's human

resources manager, in which she accused the company of racial discrimination.  (Pl.'s Ex. B,

September 14, 2022 Letter from Hairston to Spivey (Dkt. 52-2) [hereinafter "September 14

Letter"]; Pl.'s Ex. I, Dep. of Bryan Paul Spivey at 21:8–22:8, May 29, 2024 (Dkt. 52-9)

[hereinafter "Spivey Dep."].)  Hairston also emailed a copy of her letter to Spivey and several

other managers.  (Pl.'s Ex. C (Dkt. 52-3).)  The letter lodged "a formal complaint of unfair

treatment and racial discrimination" related to her proposed demotion and replacement by

Adkins.  (September 14 Letter.)  Hairston wrote:

> For the record, I am not going to quit.  I am going to accept the demotion and
> pay cut and sue you for racially discriminating against me.  I am not sure why
> you thought it would be ok to demote me after being nothing but an
> outstanding employee so you could promote a white woman to my position,
> but that is not ok and I'm not going to stand for it. . . . I will work as a dryer
> operator, change my shift, and take the cut in pay.  You're going to pay me a lot
> more when I take this to court.

(*Id.*)

---

[3] Several other details of this meeting are disputed or unclear.  Martinez indicates that Hairston initially did not object to Adkins replacing her and only voiced concerns days later, which suggests he and Fernandes might have told her of the demotion before September 14.  (Martinez Dep. at 72:15–73:19.)  The parties dispute whether Hairston, upon learning of the demotion, threatened to resign before changing her mind.  (*Compare* Fernandes Decl. ¶ 16; Martinez Dep. at 73:20–74:6 *with* Hairston Dep. at 127:14–131:6.)  They also dispute whether Fernandes and Martinez asked Hairston to train Adkins to replace her.  (*Compare* Hairston Dep. at 126:15–21 *with* Martinez Dep. at 75:12–20; Def.'s Answers to Interrogs. at 9.)  Ultimately, these disputes are not material to the parties' summary judgment motions.  The key fact is that Hairston learned by September 14 that Nilit planned to demote her and name Peggy Adkins as the new IP supervisor.

Spivey immediately contacted Nilit president Manuel Guerra, Fernandes, and Nilit's legal counsel to inform them of Hairston's letter. (Spivey Dep. at 23:9–15.) The group held a phone call on September 15. (*Id.* at 27:19–28:19.) After discussing Hairston's complaint, the group "didn't come up with any firm plan" and instead decided to "just see where it goes, build a plan, and execute the plan." (*Id.* at 28:10–14.)

3. Events leading to Hairston's termination on September 16, 2022

Nilit terminated Hairston's employment on September 16, two days after she submitted the letter accusing the company of racial discrimination. (Pl.'s Ex. J, Termination Letter (Dkt. 52-10).) Nilit told Hairston it was terminating her for disturbing the workplace and "[f]omenting fellow employees." (*Id.*; *see* Spivey Dep. at 38:15–17.)

Nilit asserts that it terminated Hairston because of two incidents that took place earlier on September 16. The first occurred when Hairston joined a morning meeting Martinez was holding with night-shift employees. (*See* Martinez Dep. at 84:7–14.) According to Hairston, Martinez told the group that "Torimika is going to be leaving and Peggy's going to be y'all's new supervisor." (Hairston Dep. at 170:6–12.) Hairston recalls that she then spoke up and said: "correction, Torimika is not going to be y'all's supervisor because they gave Peggy my job." (*Id.* at 170:18–21.) When another employee asked Martinez why Adkins was taking over the position, Martinez "said we'll talk about that later." (*Id.* at 171:6–20.)

Martinez's account of the morning meeting differs. He states that Hairston spoke up first to address "rumors" she was going to leave the plant or change positions. (Martinez Dep. at 84:7–22.) Hairston, he recalls, then told the group that "they are going to change me, but I don't want that." (*Id.* at 84:22–85:6; *see* Pl.'s Ex. O, Martinez Statement (Dkt. 57-1).) Martinez

states that he responded by telling the other employees he was unable to discuss the matter. (Martinez Dep. at 85:17–86:1.)  He admits that Hairston spoke in her "usual" tone during the meeting but describes her comments as "unusual." (*Id.* at 87:7–88:1.)

The second incident occurred when, after the morning meeting, Hairston discussed her demotion with a group of day-shift employees on the factory floor.  The parties dispute exactly what transpired during these conversations.  According to Hairston, some of the employees brought up her demotion before she did because Adkins already had told them about the change in IP supervisors.  (Hairston Dep. at 176:10–180:17.)  Hairston testifies that the employees asked her about the change, and she confirmed she would be transferring to work as a dryer operator.  (*Id.* at 179:10–19.)  Hairston also notes that a couple of the employees were upset because they had not been selected as the new IP supervisor.  (*Id.* at 180:18–184:4.)

Lilia Wu, another Nilit employee, testifies that she saw Hairston speaking to co-workers in the IP area around this time.  (Pl.'s Ex. K, Dep. of Lilia Wu at 16:22–14, May 30, 2024 (Dkt. 52-11) [hereinafter "Wu Dep."].)  According to Wu, Hairston appeared unhappy and "nervous about something," spoke in a tone that was "just a little bit loud," and gestured with her hands. (*Id.* at 16:10–14, 17:2–18:7, 19:13–22.)  Wu testifies that she told Hairston to "calm down" and that it "bothered" her that Hairston was raising concerns with fellow employees rather than her supervisor.  (*Id.* at 16:10–14, 17:10–15.)  Wu then told Martinez what she had observed and encouraged him to talk to Hairston.  (*Id.* at 14:9–11, 18:9–19:10.)

Martinez recounts hearing from Wu that Hairston "was talking loud, yelling in the IP area."  (Martinez Dep. at 88:20–89:21.)  After talking to Wu, Martinez walked through the factory floor and noticed that the day-shift employees appeared "disconcerted," were not

working, and were congregated in one area.  (*Id.* at 90:6–91:17.)  Hairston's conversations with

the employees had ended by the time Martinez visited the area.  (*Id.* at 96:6–17.)  Martinez

then reported the morning's events to Bryan Spivey.  (*Id.* at 93:18–94:4; Spivey Dep. at 31:3–

17.)

Wu testifies that she did not immediately speak to Spivey about her interaction with

Hairston.  (Wu Dep. at 21:18–20.)  At some point after September 16, Spivey asked her to

provide a written statement about the conversation.  (*Id.* at 25:9–15; Spivey Dep. at 40:16–

41:7.)  Wu's written statement, which she apparently emailed to Spivey on October 4, 2022,

read:

> On Friday, September 16, I went to say goodbye to Torimika to wish her good
> luck on her new challenge.  However, she started talking loudly saying that she
> would not leave and that the lawyer advised her to stay at the company for
> another year and a half, claiming to be being discriminated against.  She also
> said she did not receive training to assume the supervisor position and that the
> new supervisor would receive training.  I looked at her and asked her, but you
> said you didn't want to be a supervisor from the beginning, you would rather
> be [a] winder operator.  She still said they offered her the position of Dryer
> Operator, but she refused.  She kept talking loudly and all the Inspectors were
> looking.  I just told her to stay calm because with the emotional challenges
> nothing can be resolved, but she continued and was very nervous.

(Pl.'s Ex. L, Wu Email Statement (Dkt. 52-12).)[4]

---

[4] Hairston vigorously disputes the authenticity of Wu's email statement.  Hairston points to deposition testimony from
Wu indicating that the statement she provided to Spivey was *handwritten*.  (*See* Wu Dep. at 25:21–26:3.)  Defense counsel
has represented that Wu's email statement is the only existing statement.  (Pl.'s Ex. M (Dkt. 52-13); Pl.'s Ex. P (Dkt. 57-
2).)  Defense counsel has produced the native email document showing the subject, sender, and recipient of the email (the
document initially produced does not include this information).  (Def.'s Resp. Ex. 1 (Dkt. 55-1).)  That document shows
Wu sent the email to Spivey and copied Martinez.  It does not identify the date and time Wu sent the email, but
correspondence between counsel indicates that the email was sent on October 4, 2022, more than two weeks after Nilit
terminated Hairston.  (Pl.'s Ex. P.)  Hairston argues that this additional information is not sufficient to establish the
statement's authenticity.  The court need not resolve this dispute to rule on the parties' summary judgment motions.  Even
if the court considered Wu's email statement (which resembles her deposition testimony), it would not affect the court's
decision on the motions.

Spivey did not ask Hairston for her account of the factory-floor conversations. (Spivey Dep. at 36:10–13.) He testifies that he instead addressed the matter by relying on "firsthand account[s]" from Martinez and Wu.[5] (*Id.* at 36:3–37:4.) Spivey met with Guerra, Fernandes, and Nilit's legal counsel, and the group determined that Hairston's conduct was "disruptive," "was disturbing the facility," and "can't be allowed." (*Id.* at 37:8–20; *see* Fernandes Dep. at 37:14–38:2; Martinez Dep. at 95:10–96:5, 96:18–98:14.) They called a meeting with Hairston and informed her that Nilit was terminating her employment, effective immediately. (Hairston Dep. at 185:3–19; Martinez Dep. at 99:3–20.) When Hairston asked for an explanation, Spivey responded that Nilit was firing her for "fomenting the employees . . . based upon what [she] said in the meeting [that] morning." (Hairston Dep. at 185:6–14.) Nilit also sent her a short letter that read: "Fomenting fellow employees interrupts and confuses. Due to your behavior this morning, Nilit is excusing you immediately. We wish you well." (Termination Letter.)

On October 4, 2022, Hairston filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Nilit discriminated and retaliated against her based on her race. (Am. Compl. ¶ 13; Compl. Ex. 1 (Dkt. 1-1).) The EEOC issued a notice of right to sue letter on May 5, 2023, which gave Hairston 90 days to file a civil lawsuit. (Compl. Ex. 2 (Dkt. 1-2).)

**B. Procedural History**

Hairston filed this lawsuit on May 6, 2023, one day after receiving the notice of right to sue letter from the EEOC. (Compl. (Dkt. 1).) Her original complaint alleged causes of

---

[5] Spivey's statement that he relied on Wu's firsthand account when deciding to terminate Hairston is inconsistent with Wu's testimony that she did not speak to Spivey on September 16. (*See* Wu Dep. at 21:18–20.)

action for racial discrimination in violation of Title VII and the Virginia Human Rights Act ("VHRA"), Va. Code § 2.2-3900 *et seq.*, retaliation in violation of Title VII and the Virginia Whistleblower Protection Law ("VWPL"), Va. Code § 40.1-27.3, and a *Bowman* claim for wrongful termination under Virginia common law. (*Id.* ¶¶ 51–93.) She seeks compensatory damages, punitive damages, and injunctive relief reinstating her to the IP supervisor position. (*Id.* at 14–15; Am. Compl. at 14–15.)

Nilit moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all counts except for the claim alleging Title VII discrimination. (Dkt. 7.) The court granted the motion to dismiss as to Hairston's VHRA discrimination claim and *Bowman* claim but denied the motion as to her two retaliation claims. (Dkts. 16, 17.)

With the court's leave, Hairston filed a first amended complaint on October 3, 2023, which corrected earlier deficiencies in her VHRA discrimination claim. (Am. Compl.) Nilit then moved to dismiss the amended VHRA retaliation claim on the ground that Hairston had failed to exhaust her administrative remedies. (Dkts. 24, 25.) The court denied that motion. (Dkts. 28, 29.)

Following the close of discovery, Hairston moved for summary judgment on her two retaliation claims. (Dkt. 51.) Nilit filed a cross-motion for summary judgment on all claims and, in the alternative, on Hairston's eligibility for backpay, emotional distress, and punitive damages. (Dkt. 53.) The court held a hearing on the motions on December 6, 2024.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court shall "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

When considering a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (citation omitted). In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Id.* (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To grant summary judgment, "the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

- 12 -

The standard is the same for cross-motions for summary judgment. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted).

### III.    Analysis

The parties' summary judgment motions address three different issues. First, Hairston and Nilit each move for summary judgment on Hairston's retaliation claims. Second, Nilit moves for summary judgment on Hairston's discrimination claims. And third, Nilit moves in the alternative for summary judgment on Hairston's requests for backpay, emotional distress, and punitive damages. The court will address each issue in turn.

### A. Retaliation Claims (Counts 3 and 4)

Hairston alleges claims for retaliation under Title VII and the VWPL. Title VII prohibits an employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice" or filed a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-3(a). Under Title VII, it is an unlawful employment practice to "discharge" or otherwise "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race." *Id.* § 2000e-2(a)(1).

In relevant part, the VWPL provides that "[a]n employer shall not discharge . . . or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee . . . reports a violation of any federal or state law or regulation to a supervisor." Va. Code Ann. § 40.1-27.3(A)(1). The parties apparently

agree that the court should apply the legal framework for evaluating Title VII retaliation claims when reviewing retaliation claims under the VWPL. *See Hairston v. Nilit Am., Inc.*, No. 4:23-cv-00011, 2023 WL 5447370, at *5 & n.5 (W.D. Va. Aug. 24, 2023).

A plaintiff may prove retaliation in violation of Title VII "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). "In the context of a retaliatory discharge, this means an employee may proceed by showing directly that she was fired in retaliation for protected activity, or by proving that any non-retaliatory justification for the firing was pretextual." *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018). Nilit and Hairston's cross-motions for summary judgment address both methods of proof. Nilit argues that the record would not permit a jury to find the company liable even under the more plaintiff-friendly *McDonnell Douglas* test. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 21–24 (Dkt. 54) [hereinafter "Def.'s Mem."].) Hairston, by contrast, argues that the record contains direct evidence—namely, deposition testimony from Fernandes—that proves her termination was retaliatory as a matter of law. (Pl.'s Mem. in Supp. of Summ. J. at 1–2 (Dkt. 52) [hereinafter "Pl.'s Mem."].)

For the reasons that follow, the court concludes that genuine disputes of material fact preclude summary judgment for either party on Hairston's retaliation claims.

1. *McDonnell Douglas* test

Under the *McDonnell Douglas* test, Hairston first must establish a *prima facie* case by showing "(i) that she engaged in protected activity, (ii) that her employer took adverse action against her, and (iii) that a causal relationship existed between the protected activity and the

adverse employment activity." *Foster*, 787 F.3d at 250 (cleaned up). If she can make that showing, the burden shifts to Nilit to articulate a legitimate, non-retaliatory reason for taking the adverse employment action. *Id.* If Nilit clears that hurdle, the burden shifts back to Hairston to rebut Nilit's evidence "by demonstrating that [Nilit's] purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (quotation marks omitted).

i. *Prima facie* elements

Nilit does not contest that Hairston has established a *prima facie* case of retaliation. First, it concedes that Hairston engaged in protected activity when she delivered the September 14 letter to Spivey that accused the company of racial discrimination. (Def.'s Mem. at 21.) Second, Nilit does not dispute that Hairston's termination qualifies as an adverse employment action.[6] (*See id.* at 21–22.) And third, Nilit does not contest that Hairston has made a *prima facie* showing of causation. (*See id.* at 21–24.) A plaintiff can establish causation at the *prima facie* stage by showing a "very close" temporal proximity between her protected activity and the adverse employment action. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). The two-day window between Hairston's September 14 letter and her September 16 termination easily meets that standard.

---

[6] Hairston suggests that her demotion was another adverse action relevant to her retaliation claims. (Pl.'s Mem. at 19–20.) But Nilit informed Hairston of her demotion before Hairston wrote the September 14 letter—indeed, the demotion decision prompted her to write the letter. Based on that timeline, it would be impossible for Hairston to establish any causal link between her protected activity and her demotion. Thus, the court will focus solely on whether Hairston's termination was retaliatory.

The parties do dispute whether Hairston's September 14 letter was her only protected activity. Hairston argues that her comments during the September 16 morning meeting and factory-floor conversations were also protected by Title VII and the VWPL. (Pl.'s Mem. at 18–19.) Her comments during the morning meeting were not. Hairston simply told those present that she was moving to another position because Adkins was replacing her as IP supervisor and, at most, said she did not want to change roles. (Hairston Dep. at 170:18–21; Martinez Dep. at 84:7–85:6.) No evidence suggests she alluded to discrimination during that exchange. And at the time, Martinez, who led the meeting, was not aware of Hairston's September 14 discrimination complaint. (Martinez Decl. ¶ 23.)

By contrast, there is evidence that Hairston raised concerns about racial discrimination during the factory-floor conversations on September 16. In its answer to an interrogatory, Nilit states that employees reported Hairston "was shouting, *accusing individuals of being racist*, and disrupting production." (Def.'s Answers to Interrogs. at 12 (emphasis added).) Ricardo Fernandes's testimony further indicates that Nilit management was aware Hairston was complaining about discrimination when speaking with other employees on the floor. Fernandes testifies that Nilit terminated Hairston because, on September 16, "she was causing problems, turbulences with people without involving properly the people [who were] not in the conversation." (Fernandes Dep. at 42:15–22; *see id.* at 45:22–46:9.) He explains that Hairston created that "turbulence" by "saying things about other people without the presence of [those] people that [were] not necessarily true." (*Id.* at 37:14–38:8.) And he then clarifies that he is referring to Hairston's allegations that "because of her color [Fernandes] replaced her by a white." (*Id.* at 40:13–16.) While Fernandes initially states he did not learn about those

allegations until after Hairston's termination, (*see id.* at 40:15–16, 43:6–9), he later reverses course and says he "believes" he heard about them from Spivey "before" her termination, (*id.* at 46:10–16). Based on Fernandes's testimony, a reasonable jury could find that Hairston alleged racial discrimination during her factory-floor conversations.

Nilit argues that Hairston's factory-floor comments are not protected activity because they were not directed at her supervisors. (Def.'s Reply in Supp. of Mot. for Summ. J. at 13–14 (Dkt. 59) [hereinafter "Def.'s Reply"].) Those comments do not qualify as protected activity under the VWPL. The VWPL protects employees who report unlawful conduct "to a supervisor," Va. Code. Ann. § 40.1-27.3(A)(1), and this district has explained that a plaintiff alleging a VWPL claim must prove they "made a good faith report of a federal or state violation to a supervisor." *Ayers v. Wal-Mart Assocs., Inc.*, No. 7:23-cv-00419, 2024 WL 4182706, at *4 (W.D. Va. Sept. 13, 2024). But Hairston's factory-floor comments may constitute protected oppositional activity under Title VII. Title VII broadly protects employees who "oppos[e] discriminatory practices in the workplace," including by "staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998); *see DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (same); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) (holding that protected activity includes "complain[ing] about unlawful practices to a manager, the union, or other employees"). The record supports a reasonable inference that Hairston's "course of conduct . . . 'communicate[d] to her employer'" her belief that it had engaged in racial discrimination. *DeMasters*, 796 F.3d at 418 (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009)).

Nilit also argues that Hairston's factory-floor comments were not entitled to protection under Title VII because they were disruptive and disclosed confidential personnel information. (Def.'s Reply at 15–17.)   As Nilit notes, "the manner in which [a plaintiff] engaged in [protected] activity" is not necessarily protected under Title VII.  *Crews-Sanchez v. Frito-Lay, Inc.*, No. 6:21-cv-00030, 2022 WL 2792207, at *12 (W.D. Va. July 15, 2022).   The Fourth Circuit has explained that "Title VII was 'not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.'"  *Laughlin*, 149 F.3d at 260 (quoting *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981)).   To determine whether an employee has engaged in "legitimate opposition activity," courts apply a balancing test that weighs "the purpose of [Title VII] to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel."  *Id.* at 259 (quoting *Armstrong*, 647 F.2d at 448).

Here, the court would need to resolve genuine factual disputes to apply this balancing test.  In important respects, Hairston's deposition testimony conflicts with Nilit's description of her conduct.  She testifies that she did not initiate the discussions about her demotion and the identity of the person replacing her on the factory floor—other employees did.  (Hairston Dep. at 176:10–180:17.)  If credited, her account raises questions about whether she disrupted the company's operations or disclosed confidential personnel information (*i.e.*, the decision to name Adkins as the new IP supervisor).   Resolving the dispute over Hairston's conduct on September 16 requires credibility determinations a court cannot make at the summary judgment stage.  *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015).

As such, the court concludes there is a genuine dispute of material fact as to whether Hairston's factory-floor comments were protected activity under Title VII.[7]

    ii.  Pretext

Nilit claims that it terminated Hairston for "insubordination, rumor spreading, and interference with other employees' efforts to complete their work on September 16." (Def.'s Mem. at 22.) Hairston apparently does not dispute that Nilit has met its burden, at the second step of the *McDonnell Douglas* test, to identify a non-retaliatory reason for her termination. (*See* Pl.'s Resp. at 19–25.) The question, then, is whether the evidence would permit a reasonable jury to find that Nilit's proffered reasons were a pretext for unlawful retaliation.

At the pretext step of the *McDonnell Douglas* test, Hairston has the burden to prove "both that [Nilit's] reason was false and that retaliation was the real reason" for her termination. *Foster*, 787 F.3d at 252 (quotation marks omitted) (cleaned up). "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for [her] termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quotation marks omitted).

Based on the summary judgment record, a reasonable jury could find that Nilit's justifications for Hairston's termination were pretextual. For one, Fernandes arguably *admits* in his deposition testimony that Nilit terminated Hairston because she accused managers of racial discrimination. Fernandes's testimony is at times difficult to decipher, and the parties sharply dispute how to interpret it. At one point, Fernandes flatly denies terminating Hairston

---

[7] Even if Hairston's factory-floor comments did not qualify as protected activity under Title VII, Nilit would not be entitled to summary judgment on the two retaliation claims. As discussed below, there is sufficient evidence that Nilit terminated Hairston's employment because she complained about discrimination in her September 14 letter, which Nilit concedes is protected activity under both Title VII and the VWPL.

because she accused him of racism. (Fernandes Dep. at 42:15–18.) But other parts of his testimony appear to contradict that statement. As noted above, Fernandes states that Nilit dismissed her because she "was causing some turbulence in the organization" by "saying things about other people without the presence of [those] people that [were] not necessarily true"— specifically, that "because of her color [Fernandes] replaced her by a white." (*Id.* at 37:14–38:8, 40:13–16; *see id.* at 42:15–22.) Critically, Fernandes then agrees that Hairston's "false claims about people" were "*part of*" the reason Nilit terminated her employment.[8] (*Id.* at 43:1–3 (emphasis added).) This certainly suggests that Hairston's complaints of racial discrimination contributed to Nilit's decision to terminate her.

To be sure, Fernandes at times suggests that he learned about Hairston's allegations only "after" Nilit decided to terminate her employment. (*Id.* at 40:15–16; *see also id.* at 43:6–9 (stating he learned Hairston had made claims against him "[b]ecause I read in the . . . letter later that I was involved with," but that "at that time I . . . was not aware that was me and Pedro and maybe someone else."); *id.* at 46:2–3 (stating he "was not aware of" "the content" of Hairston's factory-floor comments "at that time").) But he later makes a conflicting statement. When asked when he "first learn[ed] that [Hairston] was making false claims about being terminated based on her race," Fernandes responds, "when I was called by Bryan [Spivey], and he told me about that." (*Id.* at 46:10–13.) Counsel then asks if "that was after

---

[8] Title VII's anti-retaliation provision "does not protect the making of a knowingly false allegation." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017). But the question is whether the employee "subjectively believe[s] that the facts she is reporting are true." *Id.* at 901–03 (affirming summary judgment for defendant on retaliation claim where employer's investigation "led it to conclude in good faith that [the plaintiff] had simply made up her conversation" with a co-worker that prompted the plaintiff's report alleging sexual misconduct). Here, Nilit has not offered any evidence casting doubt on Hairston's subjective belief that she had experienced racial discrimination. Fernandes's belief that her claims were false merely reflects his own value judgment about her claims.

she was terminated," and Fernandes replies: "No. I believe that was before, but I'm not sure."[9]
(*Id.* at 46:14–16.) A reasonable factfinder could discount Fernandes's claims that he only
learned about Hairston's allegations after September 16—and credit his apparent admission
that her allegations were "part of" the reason for her termination. (*Id.* at 43:1–3.)

While the parties devote the most attention to Fernandes's testimony, it is not the only
evidence suggesting that Nilit's proffered reasons for terminating Hairston were pretextual.
Hairston's deposition testimony also creates a genuine dispute about whether she disrupted
operations or disclosed confidential information during the September 16 morning meeting
or on the factory floor later that day. She testifies that Martinez first brought up the IP
supervisor change during the meeting, (Hairston Dep. at 170:8–173:2), and Martinez admits
Hairston spoke in her "usual" tone when addressing the group. (Martinez Dep. at 87:7–10.)
And as noted above, Hairston also denies that she was the one who brought up her demotion
on the factory floor. (Hairston Dep. at 176:10–180:17.) Resolving the dispute about
Hairston's conduct on September 16 requires credibility determinations properly left to the
jury. If a jury credits Hairston's account, it could find that Nilit terminated her because she
accused the company of racial discrimination in her September 14 letter (or in her September
16 comments on the factory floor).

Nilit's decision to dismiss Hairston without meaningfully investigating her alleged
conduct further supports a reasonable inference that the reasons for her termination were
pretextual. The Fourth Circuit has explained that "evidence of an obviously inadequate

---

[9] While counsel's question refers to complaints about Hairston being "terminated," Fernandes evidently believed counsel
was asking about her complaints arising from her demotion. If Hairston complained about her termination, Fernandes
could not have learned of that complaint before Nilit actually terminated her.

investigation into [an] employee's misconduct could tend to show that claimed employee misconduct was actually a pretext for prohibited animus." *Villa*, 858 F.3d at 905. "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Sharif v. United Airlines*, 841 F.3d 199, 206 (4th Cir. 2016) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Spivey's actions on September 16 arguably fall short of that standard. Spivey testifies that he decided not to interview Hairston about her September 16 conduct and instead relied on Martinez and Wu's "firsthand" accounts when deciding to terminate Hairston's employment. (Spivey Dep. at 36:2–37:6.) But it is unclear that Spivey even heard Wu's account before making that decision. Wu herself testifies that she did not speak to Spivey on September 16. (Wu Dep. at 21:18–20.) If Wu's testimony is correct, then Spivey relied solely on Martinez's second-hand account of Wu's observations, only asked Wu for her account some time after September 16, and never asked Hairston for her side of the story before terminating her.

In sum, a reasonable jury could find that Nilit's proffered reasons for terminating Hairston were pretextual and that Nilit ended her employment because she accused the company of racial discrimination. Thus, the court will deny Nilit's motion for summary judgment on Hairston's retaliation claims.

## 2. Direct evidence of retaliation

In her motion for summary judgment, Hairston argues that the record contains direct evidence of retaliation that establishes Nilit's liability as a matter of law. She contends that Fernandes undisputedly admitted that Nilit terminated her employment because she accused the company of racial discrimination. (Pl.'s Mem. at 1–2, 14–27.)

A plaintiff may choose to bypass the *McDonnell Douglas* burden-shifting framework and instead prove retaliation through direct evidence. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 n. 4 (4th Cir. 2005). Direct evidence consists of "conduct or statements that reflect the alleged discriminatory attitude and that bear directly on the contested employment decision." *Walton v. Harker*, 33 F.4th 165, 176–77 (4th Cir. 2022). For the plaintiff to prevail, the evidence "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Nilit can defeat Hairston's motion for summary judgment by establishing a genuine dispute of material fact as to any element of her retaliation claims. *See Suiter v. Johnson*, No. 5:22-cv-00031, 2023 WL 5699081, at *2 (W.D. Va. Sept. 1, 2023) (citing *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299–300 (4th Cir. 2012)).

Hairston is not entitled to summary judgment on her retaliation claims. Parts of Fernandes's deposition testimony may support a finding that Nilit terminated Hairston because she complained about discrimination, but his testimony, reviewed in its entirety, does not compel that conclusion. Fernandes's testimony is full of contradictions. For the reasons already discussed, a jury reasonably could interpret it as an admission that Hairston's "false claims" of racism contributed to her termination. But at other points, Fernandes states that he did not learn Hairston had accused him and Martinez of racism until after Nilit terminated her, and he asserts that Nilit made that decision because she was disrupting operations. (Fernandes Dep. at 40:15–16, 42:15–22, 43:6–9, 46:2–3.) At the summary judgment stage, the court may not decide which parts of his testimony are more credible than others.

- 23 -

Hairston argues that another excerpt from Fernandes's deposition provides "irrefutable evidence of causation." (Pl.'s Mem. at 25–26.) That excerpt starts with Fernandes stating he found out Hairston "was making false claims about Pedro" because "some people [were] saying that me and Pedro were dismissing her because of racism." (Fernandes Dep. at 44:9–13.) The following exchange then occurs:

Q: Okay. So you had heard that she was making a false claim that Pedro was a racist?

A: Yes.

Ms. Geller: Object to form. You can answer.

Q: And that's why –

A: Yes.

Q: And that's why you fired her?

A: Yes.

Ms. Geller: Object to form.

(*Id.* at 44:16–45:3.) Hairston focuses on Fernandes's answer to the final question, but that answer is not necessarily an admission that Nilit fired her because she made the discrimination claims. It is possible that Fernandes, across his multiple answers, meant to convey that he learned about Hairston's "false claims" only when he heard rumors that Nilit had fired her because she accused Martinez of racism. Fernandes later states that he may have learned about Hairston's "false claims" *before* Nilit terminated Hairston, (*id.* at 46:10–16), but it is the jury's role to decide which statement is more credible.

Nor does any other evidence entitle Hairston to summary judgment. She also notes that Spivey admitted that he received her September 14 letter, described her allegations as

"volatile," and responded to the letter by convening a meeting with Nilit leadership. (Pl.'s Mem. at 24–25; *see* Spivey Dep. at 27:7–28:19.) But that evidence hardly establishes that her termination was retaliatory as a matter of law.

Accordingly, the court will deny Hairston's motion for partial summary judgment.

**B. Discrimination Claims (Counts 1 and 2)**

Hairston alleges two causes of action for racial discrimination in violation of Title VII and the VHRA. Title VII makes it an unlawful employment practice "for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-(2)(a)(1). The VHRA includes a near-identical prohibition on racial discrimination. *See* Va. Code Ann. § 2.2-3905(B)(1)(a).

The court applies the same legal framework to evaluate both discrimination claims. *See Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 394 n.4, 396 (W.D. Va. 2023). Hairston does not offer any direct evidence of racial discrimination, so she must rely on the *McDonnell Douglas* burden-shifting test. *See Abilt v. CIA*, 848 F.3d 305, 315 (4th Cir. 2017). Under that test, Hairston first must establish a *prima facie* case of discrimination. *Id.* If she clears that hurdle, the burden shifts to Nilit to identify a legitimate, non-discriminatory reason for its adverse employment action. *Id.* If Nilit makes that showing, the burden shifts back to Hairston to prove by a preponderance of the evidence that Nilit's reason is a pretext for discrimination. *Id.*

1. _Prima facie_ elements

Hairston alleges that Nilit discriminated against her by failing to train her for the IP supervisor role, demoting her from that role, deviating from company protocol when investigating the allegations related to her conduct on September 16, and departing from the company's disciplinary policy when it decided to terminate her. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 16 (Dkt. 58) [hereinafter "Pl.'s Resp."].)

To establish a _prima facie_ case of disparate-treatment discrimination, a plaintiff generally must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."[10] _Coleman v. Md. Ct. of Appeals_, 626 F.3d 187, 190 (4th Cir. 2010) (citing _White v. BFI Waste Servs., LLC_, 375 F.3d 288, 295 (4th Cir. 2004)). Different _prima facie_ elements apply to Hairston's claims that Nilit deviated from its investigation protocol and disciplinary policy. Those claims do not require proof that she was performing at a satisfactory level. _See Moore v. Safehome Sys., Inc. Bd. of Dirs._, No. 7:21-cv-00452, 2021 WL 8315497, at *3 (W.D. Va. Dec. 22, 2021). Instead, Hairston must show that Nilit's investigation differed from its investigations of employees outside her protected class who engaged in similar alleged misconduct, and that "the disciplinary measures enforced against [her] were more severe than those enforced against" comparable employees outside her protected class. _Cook v. CSX Transp. Corp._, 988 F.2d 507, 511 (4th Cir. 1993).

---

[10] Hairston asks the court to apply different _prima facie_ elements, which would require her to establish (1) protected status, (2) an adverse action, and (3) a causal link between her protected status and the adverse action. (Pl.'s Resp. at 15.) Those are the _prima facie_ elements for a discrimination claim under the Americans with Disabilities Act, not a Title VII discrimination claim. _See, e.g._, _Ayers_, 2024 WL 4182706, at *6.

Hairston has not established a *prima facie* case for any of her discrimination claims. Starting with the claims based on Nilit's response to her conduct on September 16, Hairston does not identify any comparator employee whom Nilit treated more favorably in an investigation or disciplinary action. She generally asserts that she "was treated differently and worse than her White counterparts." (Pl.'s Resp. at 16.) But she does not offer any evidence that Nilit ever applied a different protocol to investigate similar alleged conduct by a non-Black employee or ever declined to terminate a non-Black employee for such conduct. (*See id.* at 16–19.)

Hairston's discrimination claim based on her demotion also fails because she has not shown her job performance was satisfactory as of September 2022. Hairston offers little to rebut Nilit's evidence that she was not performing well as IP supervisor at that time.[11] She points to (1) her positive annual evaluation for the 2021 calendar year, which she received in March 2022, (2) her own views of her performance, which she articulated in her deposition testimony, and (3) a couple statements others made about her performance.

Hairston's positive evaluation for 2021 does not create a genuine dispute of material fact as to her performance in September 2022. Courts must evaluate an employee's performance "at the time of the adverse employment action." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *see also Salmoiraghi v. Veritiss, LLC*, No. 1:19-cv-01405, 2022

---

[11] Fernandes and Martinez's declarations provide much of the evidence that Hairston's performance as IP supervisor was inadequate. While courts may not grant summary judgment based solely on self-serving affidavits or declarations submitted by the moving party, *Pfaller v. Amonette*, 55 F.4th 436, 449–50 (4th Cir. 2022), Nilit does not rely exclusively on Fernandes and Martinez's declarations. Fernandes, for example, also addresses Hairston's unsatisfactory performance in his deposition testimony. (*See* Fernandes Dep. at 25:19–26:18 (explaining that he and Martinez asked Hairston to move to an operator position because she "was not able to deliver" certain "abilities or skills" as IP supervisor due to her "lack of experience").)

WL 1036769, at *9 (E.D. Va. Apr. 6, 2022) (holding that plaintiff did not satisfy the satisfactory performance element by "pointing to the positive employee reviews" that "predated" the alleged start of his performance issues), *aff'd*, 2023 WL 5289371 (4th Cir. 2023).   Hairston notes that "no one ever pulled [her] to the side to tell [her that her] performance was lacking." (Pl's Answers to Interrogs. at 10).   But a lack of discipline or negative feedback is not legally sufficient evidence of satisfactory performance.   *See Sugar v. Emory & Henry Coll.*, No. 1:20-cv-00005, 2021 WL 3188307, at *8 (W.D. Va. July 28, 2021).

Nor are Hairston's own views of her performance enough to create a jury question. "[I]t is the perception of the decision-maker that is relevant" to establishing a *prima facie* case of discriminatory discharge.   *Salmoiraghi*, 2022 WL 1036769, at *9 (citation omitted); *see Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996).   A plaintiff's self-assessment of her performance "cannot establish a genuine issue as to whether [she] was meeting [her employer's] expectations."   *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *see Salmoiraghi*, 2022 WL 1036769, at *9.

Hairston further states that Martinez acknowledged she had "nowhere near enough time to learn the[] tasks" she had to perform when she "filled in for several different supervisors and former supervisors so they could take vacation," and that he told her she "was doing a great job under these circumstances."   (Pl.'s Answers to Interrogs. at 10.)   But those statements relate to Hairston's work as a *fill-in supervisor*, not her performance as the supervisor of the IP department.   (*See id.*)   Martinez's remarks do not speak to her performance as IP

supervisor around September 2022.[12]  Hairston has not pointed to any facts that genuinely

dispute Nilit's evidence that she was not performing well in that role at that time.

Lastly, Hairston has not established a *prima facie* case of discrimination based on her

lack of training for the IP supervisor role.  She argues that Nilit denied her requests for training

but then provided training to Adkins when she took over as IP supervisor.  (Pl.'s Resp. at 16–

17.)  To prove disparate treatment, she must identify a comparator employee who is similarly

situated "in all relevant respects."  *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).

Hairston makes no attempt to show that Adkins qualifies as a comparator under that standard,

so this theory of discrimination also fails as a matter of law.

Because Hairston has not offered legally sufficient evidence of racial discrimination at

the *prima facie* stage, the court will grant Nilit summary judgment on Hairston's two

discrimination claims.

### C. Damages

Nilit also moves for summary judgment on Hairston's requests for backpay, emotional

distress damages, and punitive damages.  The court will deny Nilit's motion as to backpay and

emotional distress damages but will grant Nilit summary judgment as to punitive damages.

1. <u>Backpay damages</u>

Nilit argues that Hairston's request for backpay damages fails as a matter of law because

she did not mitigate her damages.  Nilit makes a couple of arguments in support of its position.

It first focuses on the fact that Hairston enrolled in a program to earn a Certified Nursing

---

[12] Hairston also states that unnamed "consultants" told her "there was no way [Nilit employees] could reach" the company's performance goals.  (Pl.'s Answers to Interrogs. at 10.)  That is an inadmissible hearsay statement, and the court may not consider it at the summary judgment stage.  *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).

Assistant ("CNA") license instead of returning to the labor market immediately after her termination from Nilit. (Def.'s Mem. at 24.) In addition, Nilit argues that Hairston later secured jobs that paid significantly more than her position at Nilit, but then voluntarily left those jobs to take a lower-paying position with the Virginia Department of Corrections. (*Id.* at 24–25.)

A successful Title VII plaintiff is presumptively entitled to backpay damages, but that entitlement "is limited by the statutory duty to mitigate damages." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 148 (4th Cir. 2017). A plaintiff must "make a reasonable effort to find other suitable employment"—she may not receive backpay for any periods where she "was not actively seeking employment." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985). When a plaintiff seeks backpay damages, the defendant has "the burden of showing [the plaintiff] was not 'reasonably diligent in seeking and accepting new employment substantially equivalent to that from which [she] was discharged.'" *Bolender v. Bio-Med. Applications of Va., Inc.*, No. 7:23-cv-00245, 2024 WL 3103329, at *12 (W.D. Va. June 24, 2024) (quoting *Consol Energy*, 860 F.3d at 148). "Neither full-time employment nor employment in the same field is necessarily required" to mitigate damages, "so long as the plaintiff did not act in bad faith by accepting a certain job." *Id.*

"[T]he question of whether a fired-employee reasonably mitigated her wage damages is 'preeminently a question of fact' that must go to a jury." *Id.* (quoting *Consol Energy*, 860 F.3d at 149); *see Antekeier v. Lab'y Corp. of Am.*, 295 F. Supp. 3d 679, 689 (E.D. Va. 2018). That said, the court may hold that a plaintiff is ineligible for backpay at the summary judgment stage if

there is no genuine dispute that she failed to mitigate her wage damages.  *See Bolender*, 2024 WL 3103329, at *12.

Here, summary judgment is inappropriate because the parties genuinely dispute whether Hairston made reasonable efforts to mitigate her damages.  To start, Nilit mischaracterizes the record when it argues that Hairston chose to remove herself from the job market to enroll in the CNA program.  Hairston took CNA courses at Medical Solutions Academy in Danville between October 2022 and December 2022.  (Pl.'s Answers to Interrogs. at 5–6.)  The record shows she applied to no fewer than four different positions while she was enrolled in the CNA program: (1) a detention officer position at Career Center of the Southeast on October 19, 2022; (2) a security officer position at Chatham Hall on October 28, 2022 (which she interviewed for in early November); (3) an inventory control analyst position at Randstad at VF Outdoors on November 20, 2022; and (4) a position at Howmet Aerospace in early December 2022.  (*Id.* at 6.)  When arguing that Hairston failed to mitigate her damages during this period, Nilit completely ignores her attempts to apply to those positions.  (*See* Def.'s Reply at 20–21.)

While the record does not show that Hairston was offered any of those jobs, her attempts to find employment while enrolled in the CNA program create a jury question on her eligibility for backpay.  The Fourth Circuit has upheld a backpay award to a Title VII plaintiff who chose to "enroll[] as a full-time college student while continuing to seek a full-time job" following his discharge from the defendant.  *Brady*, 753 F.2d at 1271.  Hairston, like the plaintiff in *Brady*, continued applying for jobs during her enrollment in the CNA program.  Further, Hairston was not even a full-time student during this period.  Her CNA program was

- 31 -

a part-time commitment that required five or six hours of work in the evenings. (Hairston Dep. at 30:19–32:20.) Hairston testifies that she could have held a full-time job while pursing her CNA license. (*Id.* at 31:8–11, 32:13–20.) She also states that she would have immediately accepted a job similar to her role at Nilit had she received an offer. (*Id.* at 193:1–4.) Indeed, she secured a position as a machine operator for Eastman Chemical not long thereafter, in January 2023. (Pl.'s Answers to Interrogs. at 5.) A jury could find that Hairston exercised reasonable diligence to seek employment while enrolled in the CNA program.

Nilit next argues that Hairston failed to mitigate when she voluntarily left higher-paying jobs for a lower-paying one in November 2023. Hairston worked at Eastman Chemical from late January 2023 through early November 2023. (*Id.*) She made $18 per hour in that role, below the $25 hourly wage she made at Nilit. (*Id.*; Pl.'s Ex. G.) From early February to early May 2023, Hairston also held a second, part-time position at Stanleytown Nursing, which paid an additional salary of $22 per hour. (Pl.'s Answers to Interrogs. at 5.) In November 2023, several months after she left the position at Stanleytown Nursing, Hairston resigned from Eastman to take a position with the Virginia Department of Corrections ("VDOC"). VDOC paid her an annual salary of $44,000 plus benefits. (*Id.*)

Nilit contends that Hairston is not entitled to backpay for the period she has worked for the Virginia Department of Corrections because she chose to leave higher-paying positions to take that role. (Def.'s Mem. at 25.) Nilit cites the Fourth Circuit's decision in *Brady*, which held that a Title VII plaintiff who "subsequently finds similar employment, but then voluntarily quits," should not receive backpay for the lost wages the plaintiff "willingly incurred." *Brady*, 753 F.2d at 1273, 1278.

Here, too, Nilit overlooks contrary facts. Hairston earned higher wages only during the three-month period she worked for both Eastman and Stanleytown Nursing. Importantly, Nilit does not point to any evidence suggesting that Hairston left the position at Stanleytown Nursing voluntarily—the record is silent on this issue. (*See* Pl.'s Answers to Interrogs. at 5.) At the time she accepted the VDOC position in November 2023, Hairston was working only at Eastman. And as Nilit conceded during oral argument, Hairston's $22 hourly wage at Eastman was roughly equivalent to the $44,000 annual salary she earns at VDOC. As such, Nilit has not established as a matter of law that Hairston failed to mitigate her damages by accepting the position at VDOC.

### 2. Emotional distress damages

Nilit next argues that Hairston has not offered enough evidence to support her request for emotional distress damages. This argument is also unpersuasive.

Hairston's claim for emotional distress damages rests largely on her deposition testimony. "[A] plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 546 (4th Cir. 2003). The testimony must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* at 546–47 (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996)). That is, it "must indicate with specificity how the plaintiff's alleged distress manifested itself" and "show a causal connection between the violation and her emotional distress." *Id.* at 547 (citations omitted and cleaned up). "[C]onclusory statements that the plaintiff suffered emotional distress" do not suffice. *Id.*

- 33 -

(quoting *Price*, 93 F.3d at 1254). Rather, the evidence of emotional distress must be "demonstrable, genuine, and adequately explained." *Price*, 93 F.3d at 1252.

Hairston has sufficiently articulated the emotional distress she suffered following her termination from Nilit. She testifies that she felt stressed and depressed, lacked motivation to get out of bed, and wanted to be alone. (Hairston Dep. at 194:12– 198:15.) She further states that she experienced various physical symptoms, including an inability to eat, weight loss, and headaches. (*Id.* at 196:3–17.) These specific details would permit a reasonable jury to award her emotional distress damages. *See Bryant*, 333 F.3d at 547 (upholding jury award of emotional distress damages based on plaintiff's testimony that she felt "embarrassed, frustrated, and angry," "didn't feel very good about coming to work," and suffered "frequent headaches, insomnia, irregular menstrual cycles, nausea, [and] vomiting" due to her distress). Hairston explains that she did not seek medical assistance for symptoms because she did not have health insurance at the time. (Hairston Dep. at 195:17–21, 196:10–12, 206:5–10.) Instead, she sought help by talking to her pastor. (*Id.* at 195:14–19.) Hairston's decision to forgo medical treatment for her physical symptoms does not defeat her claim for emotional distress damages. In *Bryant*, the Fourth Circuit upheld an award of emotional distress damages for a plaintiff who similarly chose to address her symptoms through "prayer and faith" rather than medical assistance. *See* 333 F.3d at 547.

Nilit also argues that Hairston has not shown a causal connection between her termination and any of the physical symptoms she identifies. But Nilit overlooks contrary evidence. For example, Nilit questions whether Hairston lost weight because of her termination based on medical records showing a negligible weight loss between June 2022 and

May 2024.  (Def.'s Mem. at 26–27; *see* Def.'s Ex. 15, Hairston Medical Records (Dkt. 54-15);

Hairston Dep. at 200:2–5.)  But Nilit omits testimony from Hairston indicating that she lost

twenty or more pounds in the immediate wake of her termination in September 2022.  (*See*

Hairston Dep. at 200:6–13.)  The evidence in the record would permit a reasonable jury to

find that Hairston's termination caused her emotional distress.

    3.  <u>Punitive damages</u>

    Finally, Nilit argues that Hairston's request for punitive damages fails because she has

not presented evidence that the company's management acted with malice or reckless

indifference to her legally protected status.  The court agrees and will grant Nilit summary

judgment on this issue.

    In Title VII cases, punitive damages are available "when the plaintiff demonstrates that

the defendant employer engaged in intentional discrimination 'with malice or with reckless

indifference to the federally protected rights of' the plaintiff."  *Anderson v. G.D.C., Inc.*, 281

F.3d 452, 459 (4th Cir. 2002) (quoting 42 U.S.C. § 1981a(a)(1), (b)(1)); *see also Gallina v. Mintz,*

*Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 123 F. App'x 558, 564 (4th Cir. 2005) (applying same

standard in a Title VII retaliation case).[13]  A plaintiff may recover punitive damages "when a

person discriminates 'in the face of a perceived risk that [her] actions will violate federal law.'"

*Anderson*, 281 F.3d at 459–60 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)).

This is a "high standard to meet."  *Consol Energy*, 860 F.3d at 151.  The focus is on "the

employer's knowledge that it may be acting in violation of federal law, not its awareness that

---

[13] Neither party argues that a different standard for punitive damages applies to Hairston's retaliation claim under the
VWPL.

it is engaging in discrimination." *Kolstad*, 527 U.S. at 535. Evidence that the decisionmaker had "at least a rudimentary knowledge" of its Title VII obligations may support an inference that the employer acted with reckless indifference, but the evidence also must show the employer "subjectively appreciated a risk that [its conduct] failed to meet those obligations."[14] *Consol Energy*, 860 F.3d at 151 (citations omitted). "[E]gregious misconduct" is not required for an award of punitive damages, but it is one form of evidence that the employer acted with the necessary mental state. *Id.* at 152 (quoting *Kolstad*, 527 U.S. at 535).

Here, there is no evidence that Spivey or other decisionmakers at Nilit acted with malice or reckless indifference to their Title VII obligations when they terminated Hairston's employment. Hairston first focuses on the fact that Spivey characterized her discrimination complaint as "volatile" and that Nilit's management met with legal counsel to decide how to respond to her complaint. (Spivey Dep. at 27:7–14; *see* Pl.'s Resp. at 27–28.) At most, these facts suggest that management recognized her complaint implicated laws prohibiting discrimination. Hairston emphasizes that Spivey also consulted with counsel before deciding to terminate her on September 16. (Pl.'s Resp. at 28.) But even drawing all reasonable inferences in her favor, that fact does not indicate that Spivey—or any other manager— recognized and subjectively appreciated the risk that terminating her might constitute retaliation under Title VII or the VWPL.

---

[14] A plaintiff also "must demonstrate that liability for punitive damages should be imputed to the employer." *Anderson*, 281 F.3d at 460. This requires the plaintiff to show that "the employee served the employer in a managerial capacity[ and] committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good-faith efforts to comply with Title VII." *Id.* (quoting *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 442 (4th Cir.), *cert. denied*, 531 U.S. 822 (2000)). Nilit does not challenge Hairston's request for punitive damages on these grounds.

Hairston also points out that Spivey is "a seasoned professional with 42 years in Human Resources." (*Id.* (emphasis in original).)  This, too, fails to create a jury question on punitive damages.  The Fourth Circuit has held that managerial experience, standing alone, is not enough to support a punitive damages award.  *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 792–93 (4th Cir. 2024) (vacating jury award of punitive damages where plaintiff "relie[d] solely on an inference that [the manager] had the requisite knowledge given his career as a corporate executive").  Rather, a plaintiff needs to offer "affirmative evidence" that the decisionmaker understood their anti-discrimination or anti-retaliation obligations.  *Id.* at 792.  Hairston does not point to any specific facts suggesting that Spivey (or another Nilit executive) had such knowledge here.  Hairston deposed Spivey and Fernandes during discovery yet did not examine their personal knowledge of anti-retaliation laws.  Nilit's employee handbook does include a brief section that prohibits discrimination based on race or other protected classifications.  (Def.'s Ex. 1 at 8–9 (Dkt. 54-1).)  But even if that supported an inference that Nilit's management understood their Title VII and VWPL obligations, no evidence suggests that they "subjectively appreciated a risk" that terminating Hairston might violate those obligations.  *Consol Energy*, 860 F.3d at 151.  Accordingly, Nilit is entitled to summary judgment on the issue of punitive damages.

## IV.    Conclusion

For the reasons set forth above, the court will deny Hairston's motion for partial summary judgment (Dkt. 51).  The court will grant in part and deny in part Nilit's motion for summary judgment (Dkt. 53).  It will grant Nilit summary judgment on Hairston's two discrimination claims (Counts 1 and 2) and on Hairston's request for punitive damages.  But

it will deny Nilit's motion as to Hairston's two retaliation claims (Counts 3 and 4) and her requests for backpay and emotional distress damages.

    An appropriate Order shall accompany this Memorandum Opinion.

    **ENTERED** this <u>20th</u> day of December, 2024.

/s/ *Jasmine H. Yoon*
_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE